# Mohr *et al. v.* Griffin.

*Bill in Equity to correct Mortgage and for Cancellation.*

1. *Cancellation of mortgage for fraud or undue influence; what necessary to be averred and proved.*—On a bill in equity filed for the purpose of correcting a mortgage and for cancelling it as a security for a certain debt, upon the ground of fraud or undue influence practiced in its procurement, mere averments or conclusions as to the existence of fraud or undue influence are insufficient, and it is necessary to aver and show facts from which fraud or undue influence is a legal result; and it is further necessary to aver and show by the evidence that the mortgagee participated in the fraud or undue influence complained of, or had notice of it, either actual or constructive.

[Mohr *et al.* v. Griffin.]

2. *Husband and wife; conveyance by wife in payment or purchase of husband's debt valid.*—Although under the statute a married woman can not convey her property as security for her husband's debt, a conveyance by her of her separate property in absolute payment of her husband's debt or a mortgage executed by her to secure the price agreed to be paid by her in the purchase of her husband's debt, to a third party, is valid.

3. *Husband and wife; surety for husband's debt; burden of proof upon wife seeking to avoid conveyance.*—Where a mortgage upon the separate property of a married woman, which shows upon its face that it was made to secure a debt due to the mortgagee by the married woman as principal and not as surety for her husband, is sought to be avoided and annulled by the wife, although she admits the execution of the mortgage, upon the ground that she executed it and the note which it was given to secure as surety for her husband, the burden of proving that the debt secured by the mortgage was solely the debt of her husband and that she was his surety in the execution of the instrument, is upon the married woman.

APPEAL from the Chancery Court of Bullock.

Heard before the Hon. WILLIAM L. PARKS.

The facts of the case are sufficiently stated in the opinion.

LOMAX, CRUM & WEIL and JINKS & BLUE, for appellant.—The wife had the legal right to purchase the demands against her husband, or to assume the payment of his debt. She may, by express authority, contract with her husband as though he was a stranger, and may pay, or assume the payment of his debts, and for that purpose she may sell and dispose of her property, real or personal.—*Hollingsworth v. Hill,* 116 Ala. 184; *Giddens v. Powell,* 108 Ala. 621; *Hubbard v. Sayre,* 103 Ala. 440; *Pratt L. & Imp. Co. v. McClain,* 135 Ala. 452; *Clements v. Draper,* 108 Ala. 214.

The charge of undue influence and fraud as averred in the complainant's bill to have been practiced and performed by her is not sustained by the evidence. Mere insinuations, innuendoes and conclusions are of no consequence, and of course whatever fraud or undue influence may have in fact been practiced upon Mrs. Griffin, in which Mohr did not participate, is unavailing.

*Pratt L. & Imp. Co. v. McLain*, 135 Ala. 452; *Walker v. Nicrosi*, 135 Ala. 353; *Grider v. A. & F. Mortgage Co.*, 99 Ala. 281, and cases there cited. So the burden of contradicting the recitals of the mortgage, that it was given to secure her own debt, and of establishing the fact, by clear and convincing evidence, that the wife is only a surety for her husband, is upon her.—*Gafford v. Speaker*, 125 Ala. 498; *Lunsford v. Harrison*, 131 Ala. 263.

THOS. S. FRAZER and NORMAN & BALDWIN, *contra.* Two debts made the consideration for the note of $2248.07, held by the said M. Mohr against her. And if either of the debts entering into the consideration for said contract and forming a part of said note for $2248.07 is illegal or fraudulent, equity will grant relief against such contract and reform the same by rescinding that part which is illegal or fraudulent and retaining intact and entire that part of said consideration which is legal and valid.—Bigelow on Frauds, 421-423; *Miner v. Bradley*, 22 Pick. 459; *Rand v. Webber*, 64 Me. 193-4; *Parish v. Stone*, 14 Pick. 211.

The debt due by the complainant's husband to Mohr and transferred and assigned by him to her, was not a sufficient consideration to support the mortgage. So far as the mortgage was given to secure said debt, the complainant was merely the surety of the husband, and to that extent, therefore, the mortgage was void.—*Richardson v. Stephens*, 122 Ala. 307; Barbour's Law of Payment, 79; 2 Jones on Mortgages (5th ed.), § 1052.

HARALSON, J.—The facts of the case are substantially, that prior to the 1st day of April, 1899, the complainant, Ada J. Griffin, a married woman, the wife of J. E. Griffin, owned and possessed 610 acres of land described in the bill, lying in Bullock county, on which she and her husband resided; that the complainant purchased the lands from her father, J. E. Hightower, in October, 1897, and he made her a deed thereto, but there remained due and owing to said Hightower on the pur-

chase money for said land, the sum of $803.07, to se-
cure which she had promised to give him a mortgage on
the lands. Mrs. Griffin had borrowed $1,600,—a part of
the money with which to pay her father for the lands,—
from the American Freehold Mortgage Company of Lon-
don, and also the sum of $128 from the Land Company
of Alabama, to secure which, she and her husband had
executed mortgages on said lands to said companies re-
spectively, which sums, together with the $803.07, aggre-
gated $2,537.07 she owed on the lands besides what in-
terest there may have accumulated. J. E. Griffin, the
husband of complainant, had been cultivating these
lands under lease from his wife, for several years prior
to 1898, and owned the stock and personal property with
which he did the farming. He procured advances to
make the crops in these years from the defendant, M.
Mohr, of Montgomery, and to secure him therefor, mort-
gaged to him from year to year the crops to be grown
on the lands, and all his personal property, including
the mules and horses, etc., with which he ran the farm.
On the 1st of April, 1898, the debts which said J. E.
Griffin owed the defendant on these several mortgages,
amounted to about $1,445. Defendant had refused to
make further advances. Griffin was anxious and con-
cerned to be put in position by which he could secure ad-
vances, and Hightower was concerned to collect his
$803.07, due him on the land, or to have it secured.
They came to Montgomery to see defendant, and as a re-
sult of a conference between them, according to defend-
ant's version of it, which the evidence tends to support,
defendant stated that he was willing to pay the debt
Mrs. Griffin owed Hightower on the land, and sell and
transfer to her the debts he held against her husband, J.
E. Griffin, secured by the mortgages referred to, amount-
ing to about $1,445, which, with the $803.07 she owed to
Hightower, aggregated $2,248.07, if Mrs. Griffin would
execute to him a mortgage on her said lands to secure
the payment of said sum. Whether defendant or said
Hightower and Griffin proposed this arrangement does
not certainly appear, but it can make no difference
which, as it was no more than preliminary negotiations
for an arrangement to be carried out in the future, if

consented to.   Some month or six weeks after this con-
ference, and on the 1 April, 1898, J. E. Griffin and his
wife, the complainant, came to Montgomery to see the
defendant, with the view of carrying said proposed ar-
rangement into effect.   After their arrival, they confer-
red with defendant, and as a result, they repaired with
him to the office of the attorneys of defendant, to which
place also the attorney of Griffin, with whom Griffin had
already conferred, was invited.   The most of the busi-
ness day was spent at this office in talking over the pro-
posed arrangement, and in the preparation of the several
papers that were executed on the occasion, carrying into
effect the agreement that was reached.   The first paper
was a mortgage, by Mrs. Griffin, joined in by her hus-
band, on said lands to secure a note by her and her hus-
band, of the same date, for $2,248.07, payable on the 1
April, 1903, with five interest notes for the interest for
each year payable, respectively, on the 1 April each year
thereafter, the last note, for $60, being payable on 1
April, 1903.   The mortgage recited that the indebtedness
was from complainant, Mrs. Griffin, to defendant,
loaned to her by him.   It provided that on default in
payment of the interest as it became due on said notes,
at the option of the defendant, the mortgagee, the whole
sum of money secured should become due and payable
and the mortgage liable to foreclosure.   It also recited,
that it was given subject to the prior mortgage of said
two loan companies.   The second was a paper, by which
it was arranged, that if the mortgage was not paid at
maturity, it might on conditions mentioned therein be
extended for another five years, making it ten years in
which Mrs. Griffin might, if needed, and conditions were
complied with, be indulged by defendant in the payment
of her said mortgage debt and interest.   This contract
was signed by the complainant and the defendant, by
and with the consent of J. E. Griffin, the husband of
complainant.

There was, at the same time, executed by the com-
plainant and the defendant, with the written consent of
complainant's husband indorsed thereon, another agree-
ment, reciting the execution and delivery by complain-

ant to defendant, of said mortgage, the object of which; as it appears on its face, was to put in written form, and not to leave it open for dispute, what was the real con- sideration on which said mortgage, and the contract be- tween the parties in reference to the same had been exe- cuted. It appears, as plainly as it had been written out on the face of the paper itself, what the real purpose and agreement between the parties were, so as to preclude any dispute in reference thereto, such as we have before us now. The paper recited: "It is understood and agreed between the said Ada J. Griffin and Michael Mohr, that the said consideration [of the mortgage] is composed as follows:    Eight hundred and eight dollars and 3-100 ($808.03) which was advanced in cash this day by the said Michael Mohr to the said Ada J. Griffin, for the purpose of paying the same to J. E. Hightower, in pay- ment of the balance due him by the said Ada J. Griffin, as purchase money for the lands so mortgaged by the said Ada J. Griffin to the said Michael Mohr; fourteen hundred and forty and 4-100 dollars ($1,440.04) for the purchase by the said Ada J. Griffin from the said Mich- ael Mohr of certain indebtedness, amounting to said sum, due to the said Michael Mohr by the said J. E. Grif- fin, which said indebtedness is secured by certain mort- gages on the property of J. E. Griffin. The claim held by the said Mohr against the said J. E. Griffin, has this day been transferred to the said Ada J. Griffin, and the said sum of fourteen hundred and forty and 4-100 dol- lars ($1,440.04) is the amount agreed to be paid by her in payment of said transfer."

As if this were not enough to foreclose all dispute as to the transaction, a receipt was, at the same time, exe- cuted by complainant to defendant acknowledging the delivery to her by defendant of seven different mort- gages by J. E. Griffin to defendant, in different amounts, the first for the year 1894 for $600, and the last, dated January 5, 1897, and payable on the 1st of September, 1897, for $1,445, together with the notes mentioned in each mortgage, which receipt stated: "All of said papers have this day been sold and transferred to me by the said M. Mohr, and which were held by him to secure an indebtedness due by the said J. E. Griffin to him,

amounting to the sum of $1,440.04, which said indebtedness has been sold and transferred to me this day by the said M. Mohr, together with the above described papers."

Mr. Weil, the attorney who prepared the papers for the parties, as he was instructed by them to do, testified that each of said papers was signed in his presence by the parties purporting to have signed them; that they were all read over and explained to Mrs. Griffin and her husband who were present; that Mr. J. D. Norman, an attorney from Union Springs, was present at the time, and examined the papers for Mrs. Griffin before they were signed. He also testified, that nothing was said by defendant in his presence either to Mrs. or Mr. Griffin in reference to the execution of the papers by Mrs. Griffin, as surety for her husband's debt, and that witness explained to complainant and told her what the papers were; that he delivered to Mrs. Griffin the papers mentioned in the receipt at the time she executed the same.

In this connection it may be stated that Mr. Norman, who was present at the office of defendant's attorney the day the papers were prepared, was examined by the complainant and he testified as to these papers: "After the papers were handed me, I took them and went to one corner of the room   \*   \*   \*   \* and read them over. I explained the papers to both of them [Mrs. and Mr. Griffin], and told them, that one was a mortgage given by Mrs. Griffin on her land to secure the debt described in it, which amounted to something over $2,000; and that the effect of the papers was, that Mr. Mohr was transferring to Mrs. Griffin a debt, which he claimed against Mr. Griffin; and I stated that if that was the agreement between them, the papers were properly prepared. I also explained the effect of the agreement which Mr. Mohr was to sign in reference to the extension of the debt for several years, and after explaining to them the papers which had been handed to me, I told them the papers were drawn up in accordance with what Mr. Griffin had told me was the agreement." He stated further, that he did not remember seeing the papers signed, and his recollection was, that he left the office before they were signed.

It was shown, that on the same day after these papers were executed, complainant borrowed from L. Bernheimer in Montgomery, $300, and executed to him a mortgage on the stock and personal property she had acquired that day from defendant. Mrs. Griffin so testified, and Mr. Bernheimer testified that he asked her at the time, how she came into the possession of the property, and she stated, that she had bought it from Mr. Mohr by giving a mortgage to him on some land, which statement was found to be true, and he let her have the money. An effort was made to show that she did not borrow this money, but that her husband did, but it was futile. The mortgage is attached to Bernheimer's testimony, signed by complainant first, and her husband afterwards, and the overwhelming weight of the evidence shows it was Mrs. Griffin's transaction.

The defendant introduced three letters purporting to have been written by Mrs. Griffin to defendant, the first without date, in which she stated that she desired to purchase from him the indebtedness of her husband to him, to the amount of $1,250.50; that she could not pay cash, but would give him security by a second mortgage on her land. This was accompanied by a postcript, in which she explains more fully her desire, and says she sends him the numbers of her land, so that he could have the mortgage prepared and sent to her, promising that she would execute and return it.

The other letter was dated November 26, 1897, written by her to defendant, stating that she wished to purchase from him the indebtedness of her husband to him, and the papers he held against him, that she could not pay cash but could give satisfactory security by a second mortgage on her land, and that Mr. Griffin would explain the matter to him fully.

When these papers were shown to her while she was being examined, and after examining them, she testified that she signed them, and as to the last one, she stated she wrote and signed it. Afterward, on rebuttal, after much questioning, she stated she did not sign the one first referred to. Mr. Griffin testified that the letters related to a proposed effort to borrow the amount from the Loan Company.

The complainant filed this bill on the 15th April, 1901, making said M. Mohr and her husband, J. E. Griffin, parties defendant. She attacked the mortgage of complainant to defendant as having been procured from her by the fraud of her husband and defendant in having said debt of $1,445 due by the husband to defendant transferred and assigned to her, and included in the note given by her to defendant; avers that she was under the dominion and control of her husband, and that defendant told her at the time that she was simply signing as security for her husband until he could pay the debt. The prayer of the bill is, that the several notes and mortgages of J. E. Griffin to defendant, Mohr, transferred by the latter to complainant, and which are alleged to be in possession of said J. E. Griffin, may be decreed to be ordered to be returned to said Mohr, and that her mortgage to said Mohr be corrected by excluding therefrom the indebtedness recited therein, except the debt to said Hightower, for $803.07, which she offers to pay to defendant, and as for which said mortgage is not sought to be cancelled or corrected.

The defendant Mohr filed his answer in which he denied the material allegations of the bill, and averred the *bona fides* of his mortgage and that the same was freely and voluntarily executed by complainant, without any fraud or misrepresentations on his part; that the same was not given as a security for the debt of complainant's husband, but for the purchase by her of her husband's indebtedness to him, and for the amount advanced by him to pay her indebtedness to her father, J. E. Hightower. He also filed his cross-bill against complainant and her husband, J. E. Griffin, setting up said mortgage, and default in the payment of the interest notes, except the first one, $119.84, and praying for a foreclosure of the same.

The chancellor on a submission of the cause and pleadings and proofs, decreed that complainant was entitled to relief; that the debt secured by the mortgage from complainant to respondent, Mohr, except the amount of the purchase money paid J. E. Hightower by him for complainant, was the debt of the husband, J. E. Griffin, and that complainant gave said mortgage as surety for the

same, and as to that part of said debt, said mortgage was void, and was ordered cancelled, but should stand as security for the purchase money advanced by defendant, Mohr, to complainant for said Hightower.

The complainant's insistence in the case is, that she did not purchase the mortgages or claims of defendant, Mohr, against her husband, and to the extent of said debt which was included in said mortgage, was a security for her husband's debt and void; that though said mortgage is in form a transfer, she was under the dominion and control of her husband and was unduly influenced by him to make the same; that he and defendant, Mohr, perpetrated a fraud upon her in having said debt of $1,445, so due by her husband to Mohr, transferred to her and included in the note she made, and she did not freely and voluntarily execute the same.

As to the fraud she deems it necessary to aver her husband practiced on her, we may say, it does appear that her husband desired her to execute said note and mortgage, although he now lends himself to making the defense by his wife, that in so doing he perpetrated a fraud on her. It is difficult to perceive his motive in practicing such a fraud on her. He owed the debt and she knew that fact; he could not readily procure advances to cultivate the farm without giving security; all he had was tied up under his Mohr mortgages, and one can well see why, in order to cultivate the farm he would desire to remove this impediment out of his way, and why complainant should be willing and even anxious to assist him in doing so, especially if in purchasing the securities against him, she might get five years, or even ten, in which to pay them. That such a deal was effected with Mohr, does not certainly appear to have been so injudicious a transaction as to appear unconscionable or even unreasonable on its face. From the husband's standpoint, it appeared to be the wise thing to do. If not, why did he counsel it? There was no consideration accruing from Mohr to him, for him to do so; and from Mrs. Griffin's point of view, she might also, have regarded it as well and wise to accomplish the trade on such terms. But, aside from this, there is no sufficient evidence to sustain the charge of fraud,

either on her husband's part or on Mohr's. There was nothing concealed, the whole transaction was laid bare to her and fully explained by the attorneys on both sides,—the one representing Mohr, and the one employed to represent her and her husband's interest. About the only thing of importance relied on is, that as alleged, she was young and inexperienced and her husband urged her to sign the mortgage, while she hesitated to do so, and that Mohr told her if she signed, it was but going security for her husband. There is no evidence that she knew the difference, at the time, between buying the debt, and standing security for it. Such an assurance from Mohr could scarcely have had influence with her, unless she knew or was informed that she could not stand her husband's security, and if she did so, the undertaking would be void. Mohr knew the difference, and it does not seem reasonable, that he would have made such a statement, while he was doing his best to avoid such a result by having everything that was done written out and fully explained before a paper was signed. Mohr denies he made such a statement. His attorney who was present all the time denies that it was made, so far as he heard; he read over the papers to her and explained their legal import, and so did the attorney of herself and husband; and that she was fully and fairly advised of what she was doing, abundantly appears from the oral testimony as well as from the several papers she signed. The utmost caution seems to have been taken to have everything understood and to leave nothing open to dispute, so far as well and plainly written documents could foreclose it. Moreover, it does not appear that Mohr ever participated in any fraud or undue influence exercised by the husband over complainant, if he did exercise any, to induce her to sign said mortgage without which she is not entitled to the relief she seeks against him.—*Pratt L. & I. Co. v. McClain*, 135 Ala. 452; 33 So. Rep. 185.

As to the other defense, that the making of said mortgage was a mere security by her for her husband, and that she did not purchase his debt of Mohr, it may be said, that there is no reasonable ground for such a

contention within the evidence but is against its over-whelming weight. If there was no fraud in the execution of the papers referred to, of which we have said there is no satisfactory evidence, the question of what the parties intended is absolutely settled by the written documents referred to. As for the capacity of a wife to buy a debt of her husband, the question has long been settled with us. In a late case, *First National Bank v. Morugne*, 128 Ala. 161, in speaking of the power of the wife over her money, it was said of the facts in that case, applicable here: "Being her money, she had a right to give it away to her husband or anybody else, and to apply it by her own hand or through her husband directly to the payment of his debts; for while the wife may not become the husband's surety, and may not pledge her property to secure his indebtedness, and her property cannot be taken for his debts, it cannot be doubted that of her own volition she may apply it to the absolute payment of his debts.—*Hollingsworth v. Hill*, 116 Ala. 184." *Glidden v. Powell*, 108 Ala. 621; *Pratt L. & I. Co. v. McClain, supra; Villa Rica L. Co. v. Paratine*, 92 Ga. 370; 2 Beach on Contracts, § 1308.

The mortgage on its face showing that it was made to secure the debt due to the mortgagee, Mohr, by the complainant as principal and not as surety for her husband, which suretyship the defendant denies, the burden of proving the debt was that of her husband and that she was his surety in the execution of the instrument, was upon the complainant, which burden she has failed to discharge.—*Lunsford v. Harrison*, 131 Ala. 263; *Gafford v. Speaker*, 125 Ala. 498.

Section 2529 of the Code providing that husband and wife may contract with each other subject to the rules of law as to contracts by and between persons standing in confidential relations, has no application to this case as to complainant's contract with Mohr, but refers solely to contracts by which the husband or wife obtains from the other some personal interest or acquires some enforceable obligation or advantage of the other.—*First Nat. Bank v. Nelson*, 106 Ala. 535.

Our conclusion is that the chancellor erred in the de-

[Johnson v. Wilson & Co.]

crce rendered in favor of the complainant in the original bill, and in denying relief to defendant, Mohr, under his cross-bill.

Reversed and remanded.